**Eisen v. Independence Blue Cross**

*Jeffrey Kodroff,* for plaintiffs.

*Edward Mannino, David Cornerford* and *James Griffith,* for defendants.

HERRON, *J.,* July 26, 2002— This opinion addresses the motion of plaintiffs Stephen C. Eisen D.C., Alice E. Wright D.C., Douglas G. Pfeiffer D.C., John Cecchini D.C., Deborah A. Carl and Sally Ann Spall to certify two putative classes which seek monetary, injunctive and

declaratory relief from the alleged policies and practices of defendants, Independence Blue Cross and its subsidiaries or corporate affiliates, which have resulted in the denial of coverage and/or reimbursement for purportedly medically necessary chiropractic treatment. The classes are defined as follows: (1) a provider class consisting of all chiropractors who are or have been in-network providers of chiropractic care to IBC subscribers through a standard contract; and (2) a subscriber class who are or were subscribers of health care plans operated or administered by IBC and/or its affiliates.

Because the plaintiffs' claims are not sufficiently typical and do not present predominating common questions of fact and law where they depend on a determination of medical necessity, the motion for certification is denied.

## FINDINGS OF FACT

### *The Parties*

(1) Plaintiff Steven C. Eisen D.C. is a licensed doctor of chiropractic who resides in Pennsylvania and treats patients, including IBC subscribers, at his offices located at the Roxborough Chiropractic Center, 6816 Ridge Avenue, Philadelphia, PA 19128-2445. Am. compl. and answer, ¶10.

(2) Plaintiff Alice Wright D.C. is a licensed doctor of chiropractic who resides in Pennsylvania and treats patients, including IBC subscribers, out of her offices located at Quality Care Physicians, 51 Orville Road, Hatfield, PA 19440. Am. compl. and answer, ¶11.

(3) Plaintiff Douglas G. Pfeiffer D.C. is a licensed doctor of chiropractic who resides in Pennsylvania and treats patients, including IBC subscribers, out of his offices located at the Upper Perkiomen Chiropractic Center, 1543 Layfield Road, Pennsburg, PA 18073-0045. Am. compl. and answer, ¶12.

(4) Plaintiff John Cecchini D.C. is a licensed doctor of chiropractic who resides in New Jersey and treats patients, including IBC subscribers, out of his offices located at the Apple Chiropractic Center, 2800 Route 130 North, Suite 102, Cinnaminson, New Jersey 08077. Am. compl. and answer, ¶13.

(5) Eisen, Wright, Pfeiffer and Cecchini are IBC network providers who have entered into a standard or "form" provider contract with one or more of the defendants, pursuant to which they have agreed to accept discounted fees for providing chiropractic services in exchange for being granted full and complete access to IBC subscribers. Am. compl., ¶14.

(6) Plaintiff Deborah A. Carl is a resident of Pennsburg, Pennsylvania, who had been a subscriber of Personal Choice, a QCC Insurance Company health care plan, which is administered by IBC, and which was provided through Carl's employer, Montgomery County Court House. Am. compl. and answer, ¶15; Carl dep. at 19.[1]

(7) Plaintiff Sally Ann Spall is currently a resident of Pawley's Island, South Carolina and a former resident

---

1. Carl's deposition transcript was attached at exhibit E, as part of an appendix to defendants' brief in opposition to plaintiffs' motion for class certification. The other named plaintiffs' deposition transcripts are also attached at separate exhibits in the aforesaid appendix.

of Palm, Pennsylvania, who had been a subscriber to Personal Choice through her husband's employer, the Upper Perkiomen, Pennsylvania School District. Am. compl. and answer, ¶16; Spall dep. at 9-16.[2]

(8) Since both Carl's and Spall's IBC health care plans are or were government-sponsored, they are exempt from the Employee Retirement Income Security Act (ERISA) of 1974, codified at 29 U.S.C. §§1001 et seq. Am. compl., ¶¶15-16.

(9) Both Carl and Spall did not talk to any of the defendants prior to selecting Personal Choice, nor did either named subscriber plaintiff identify any misrepresentation made within or outside of the subscriber agreement which relates to their denial of coverage for a chiropractic condition. Carl dep. at 19, 27, 35-38; Spall dep. at 15-16, 48-49, 63-66.

(10) Defendant IBC is a nonprofit corporation organized pursuant to the laws of the Commonwealth of Pennsylvania, including the Nonprofit Hospital Plan Corporations Act, 40 Pa.C.S. §6101 et seq., which, inter alia, authorizes it to enter into contracts with subscribers for the payment of certain hospital and medical costs. Answer, ¶19.

(11) IBC, with its principal place of business at 1901 Market Street, Philadelphia, Pennsylvania, is an independent licensee of the Blue Cross/Blue Shield Association and is a parent corporation of and/or is indirectly

---

2. Spall's deposition transcript is attached at exhibit F to the aforesaid appendix.

related to each of the IBC subsidiary defendants. Answer, ¶19.

(12) The IBC subsidiary defendants which remain in this case[3] are Keystone Health Plan East Inc., AmeriHealth Insurance Company, QCC Insurance Company and AmeriHealth Administrators Inc.

(13) Defendant Keystone Health Plan East Inc. is a for-profit corporation and a wholly-owned subsidiary of AmeriHealth Inc., and it operates a health maintenance organization and has its principal place of business at 1901 Market Street, Philadelphia, Pennsylvania 19103. Am. compl. and answer, ¶20(b).

(14) Defendant AmeriHealth Insurance Company is a for-profit corporation and a wholly-owned subsidiary of AmeriHealth Inc., which operates an insurance agency at 1901 Market Street, Philadelphia, Pennsylvania 19103. Am. compl., ¶20(f).[4]

---

3. In a previous opinion, this court granted the motion for summary judgment of defendants, AmeriHealth Inc., AmeriHealth Integrated Benefits Inc. f/k/a American Health Alternatives, Healthcare Delaware Inc. and Vista Health Plan Inc. and dismissed the named plaintiffs' claims against these entities on the grounds that the named plaintiffs lacked standing to sue because there is no privity of contract and no evidence of any relationship with these entities. See *Eisen v. Independence Blue Cross,* August 2000, no. 2705, slip op. at 13-14 (C.P. Phila. May 6, 2002) (Herron, J.). For purposes of clarity and since this court is denying the motion for certification, this opinion will only address the motion for certification as to the remaining subsidiary defendants even though the previous opinion noted that the court's ruling on the summary judgment motion was only binding as to the named plaintiffs.

4. In their answer, defendants deny this allegation and assume that plaintiffs intended AmeriHealth Insurance to mean AmeriHealth Insurance Company of New Jersey. Answer, ¶20(f). Since discovery on

(15) Defendant QCC Insurance Company is a for-profit corporation and a wholly-owned subsidiary of Ameri-Health Inc., with its principal place of business at 1901 Market Street, Philadelphia, Pennsylvania 19103, and is a party to contracts with Montgomery County and the Upper Perkiomen School District. Am. compl. and answer, ¶20(g).

(16) AmeriHealth Administrators Inc. is a for-profit corporation which operates as third-party claim administrators that provides for payments to health care providers. Am. compl., ¶20(i).

*The Relevant Agreements and Pertinent Provisions*

(17) The professional provider agreement, is essentially a form contract, which requires the provider plaintiffs to provide beneficiaries with "covered services," defined as "[t]he medically necessary health care services and supplies that are to be provided pursuant to a benefit program." Am. compl., ¶39; am. compl., exhibit A, ¶¶1.9, 2.2(a).

(18) Pursuant to the provider agreement, providers agree to provide covered services in "the same manner, and with the same availability, as services are rendered to other patients without regard to reimbursement." Am. compl., exhibit A, ¶2.2(a).

(19) The provider agreement also defines "medically necessary or medical necessity" as follows:

---

the merits has not yet commenced and no other motion to dismiss AmeriHealth Insurance has been made, this court will accept the allegation as true for purposes of ruling on the motion for certification.

"The requirement that covered services or medical supplies are needed, in the opinion of: (a) the primary care physician or the referred specialist, as applicable, consistent with [IBC] policies, coverage requirements and utilization guidelines; and (b) [IBC] in order to diagnose and/or treat a member's illness or injury, as applicable, and:

"(A) are provided in accordance with accepted standards of American medical practice.

"(B) are essential to improve the beneficiary's net health outcome and may be as beneficial as any established alternatives;

"(C) are as cost-effective as any established alternatives; and

"(D) are not solely for the beneficiary's convenience, or the convenience of the beneficiary's family or health care provider." Am. compl., exhibit A, ¶1.13.

(20) Pursuant to the provider agreement, the providers are obligated to warrant inter alia that they are licensed and credentialed to provide covered services and that they shall render such services in accordance with the terms of the provider agreement, the utilization management program, quality management program, benefit program requirements, grievance, appeals and other policies and procedures of the particular benefit program as detailed in the provider manual, and pursuant to the clinical quality of care and performance standards that are professionally recognized and/or adopted, accepted or established by IBC. Am. compl., exhibit A, ¶2.2(a).

(21) In exchange for rendering these services, providers will receive compensation according to a "reimbursement schedule" less any co-payment amounts payable by beneficiaries in accordance with the applicable benefit program. Am. compl., exhibit A, ¶3.1.

(22) Pursuant to the provider agreement, the providers agree "to cooperate and comply with all decisions rendered in connection with [IBC's] utilization management program . . . [and] to provide such records and other information as may be required" under such program. Am. compl., exhibit A, ¶2.7.

(23) Providers are also limited by the provider agreement to not seek payment for rendering covered services unless prior authorization or referral was obtained, except where a particular benefit program or the utilization management program does not require prior authorization or in the case of an emergency so long as the provider attempts to obtain prior authorization. Am. compl., exhibit A, ¶2.8.

(24) The terms and conditions of healthcare benefits offered by defendants to the subscriber plaintiffs are set forth in the subscriber agreement which is materially identical for each of defendants' healthcare plans and for each subscriber plaintiffs. Am. compl., ¶96.

(25) The subscriber agreement states that the "Carrier only covers treatment which it determines medically appropriate/medically necessary." Am. compl., exhibit B—introduction.

(26) The subscriber agreement defines the term "medically necessary" as follows: services or supplies provided by a professional provider that the carrier determines are:

"(A) appropriate for the symptoms and diagnosis or treatment of your condition, illness, disease or injury;

"(B) provided for the diagnosis, or the direct care and treatment of your condition, illness, disease or injury;

"(C) in accordance with current standards of good medical practice;

"(D) not primarily for your convenience, or the convenience of your professional provider; and

"(E) the most efficient and economical supply or level of service that can safely be provided to you. . . ." Am. compl., exhibit B at 7.[5]

(27) The subscriber agreement further describes the circumstances for when certain medical services, rendered by chiropractors, including restorative services and/or physical therapy, are covered. Am. compl., ¶98.

(28) With respect to restorative services, the subscriber agreement states as follows:

"*Restorative Service.* Benefits shall be provided, up to the limits specified in the schedule of benefits, for restorative services when performed by a professional provider in order to restore loss of function of a body part. Restorative services are any services, other than those specifically detailed above under Therapy Services, provided in accordance with a specific plan of treatment related to the covered person's condition which generally involve neuromuscular training as a course of treatments over weeks or months. Examples of restorative

---

5. The term "medically appropriate" is nearly identical to the definition of "medical necessity" and does not require further elaboration. See am. compl., exhibit B at 7.

services include, but are not limited to, manipulative treatment of functional loss from back disorder, therapy treatment of functional loss following foot surgery, and treatment of oculomotor dysfunction.

*"Following a determination by a professional provider that restorative services are required, a specific plan of treatment must be pre-certified by the carrier. Failure to pre-certify non-preferred services will result in a 50 percent reduction in benefits payable for these services."* Am. compl., exhibit B at 24-25. (emphasis in original)

(29) As for therapy services, the subscriber agreement states, in pertinent part, as follows:

*"Therapy services.* Benefits shall be provided, subject to the benefit period maximums specified in the schedule of benefits, for the following services prescribed by a physician and performed by a professional provider, a registered, licensed therapist, and/or facility provider, which are used in treatment of an illness or injury to promote recovery of the covered person. . . .

*"Physical therapy.* Includes treatment by physical means, heat, hydrotherapy or similar modalities, physical agents, bio-mechanical and neuro-physiological principles, and devices to relieve pain, restore maximum function, and prevent disability following disease, injury, or loss of body part. Benefits are provided up to the number of visits specified in the schedule of benefits. . . .

*"Preprocedure certification is required for the following therapy services: Physical . . . as described in the managed care section of the booklet/certificate. Failure to pre-certify non-preferred services will result in . . . a*

*50 percent reduction in benefits payable for physical . . . therapies.*" Am. compl., exhibit B at 23-24. (emphasis in original)

(30) The subscriber agreement also includes procedures for member's complaints along with an appeals process at two levels. Am. compl., exhibit B at 58.

### The Named Providers' Practices and Contractual Relationships

(31) Eisen testified that he treats patients under the following IBC health care plans: Personal Choice, Keystone Health Plan East and AmeriHealth. Eisen dep. at 36-37.[6]

(32) The evidence shows that Eisen had dealings with AmeriHealth Administrators who certified or limited certification for treatment of certain of Eisen's patients. Smalley aff., exhibits B, C and D.

(33) Eisen also testified that coverages for particular treatments for individual patients differ depending on what a particular patient's benefit package provides and what Blue Cross policy the patient has. Eisen dep. at 44-49.

(34) Wright testified that she is a provider for Personal Choice, Keystone "when a patient can get a referral," and that she or members in her practice treated patients who used AmeriHealth Administrators. Wright dep. at 13-14, 48, 165.[7]

---

6. Eisen's deposition transcript is attached at exhibit B to the aforesaid appendix.

7. Wright's deposition transcript is attached at exhibit D to the aforesaid appendix.

(35) Wright's practice at Quality Care Physicians is an integrated practice which combines the expertise of medical doctors, chiropractors, physiotherapists, rehabilitation and diagnostic testing. Wright dep. at 79-81.

(36) Wright also testified that patients covered by personal choice have different limits for chiropractic care and different co-pay benefits. Wright dep. at 163.

(37) Pfeiffer is a participating provider for Personal Choice and may treat patients with AmeriHealth coverage, but he does not provide in-network coverage for patients under Keystone Health Plan East. Pfeiffer dep. at 20, 84, 93-94.[8]

(38) Pfeiffer testified that he treats approximately 80 to 100 chiropractic patients per day while the average chiropractor sees approximately 60 patients per day. Pfeiffer dep. at 72, 217-18.

(39) Pfeiffer also related that his patients have different terms of coverage in terms of co-payments and that different treatment plans are provided depending upon the individual diagnosis. Pfeiffer dep. at 82-90.

(40) Cecchini has treated patients covered under the Keystone Health Plan East as well as subscribers of AmeriHealth Administrators Inc. Cecchini dep. at 142;[9] Smalley aff., exhibit A, G and I.

---

8. Pfeiffer's deposition transcript is attached at exhibit C to the aforesaid appendix.

9. Cecchini's deposition transcript is attached at exhibit A to the aforesaid appendix.

(41) Cecchini also testified that he recalled only one patient who was denied coverage during the pre-certification stage. Cecchini dep. at 65-66, 118, 124-25, 135-36.

(42) Like the other providers, Cecchini acknowledged that different plans have different policies and different terms of coverage. Cecchini dep. at 150-51.

(43) Each of the named providers testified that the determination of whether a patient was improperly denied a "medically necessary" procedure or whether the care was in fact "medically necessary" depends on the patient's medical history, the examination of the patient and other relevant documentation and is determined on a case-by-case basis. Cecchini dep. at 120-25, 206-207; Eisen dep. at 33, 87; Pfeiffer dep. at 195-97, 201-203; Wright dep. at 183, 199.

(44) Each of the named providers also testified that if they disagreed with the denial of care or the limitation on the number of a particular patient's visits imposed by defendants, that the provider could ask for more visits or could appeal the initial decision and would sometimes get more visits or would sometimes be denied these additional visits. Cecchini dep. at 126-27, 130-31, 209; Eisen dep. at 75-76, 106-108, 114-15; Pfeiffer dep. at 104-106, 142-43, 148-49, 178-80; Wright dep. at 157-62.

(45) Carl testified that she was denied coverage for certain treatments purportedly on the basis of medical necessity while other conditions were not denied coverage. Carl dep. at 61-65.[10]

---

10. Whether in fact Carl was denied treatment based on medical necessity must be determined at trial.

(46) Carl's chiropractor is Pfeiffer who she's been seeing for approximately 18 years. Carl dep. at 15.

(47) Spall was denied additional chiropractic treatment on one or two occasions; she appealed those denials and was authorized for additional visits. Spall dep. at 34-41.

(48) Spall is a former chiropractic patient of Pfeiffer's. Spall dep. at 18.

### The Nature of Plaintiffs' Claims and Defendants' Alleged Misconduct

(49) The gravamen of both the provider and the subscriber plaintiffs' claims challenge IBC's alleged policies and practices of denying purportedly medically necessary chiropractic care in direct contravention of its contractual obligations in order to reduce IBC's medical expenses and maximize its profitability. Am. compl., ¶1.

(50) IBC's alleged improper policies and/or practices, resulting in the alleged improper denials of coverage or reimbursement, include as follows:

"(1) Improper bundling and downcoding of chiropractic services, *i.e.,* by imposing new conditions (*i.e.,* time limits and risks of complications, morbidity or mortality) in order to bill for higher complexity codes or by bundling various levels of services into one code but not reimbursing chiropractors for other unrelated but medically necessary services (*i.e.,* x-rays, using electrical stimulation, etc.).

"(2) Improperly denying reimbursement or coverage for 'chronic' condition as opposed to acute conditions and denying pre-certification based on patient's history.

"(3) Improperly denying coverage based on artificial estimates of percentages of improvement.

"(4) Improperly relying on unsupported algorithms to restrict the number of approved chiropractic treatments. and

"(5) Using unqualified personal to make coverage decisions based on medical necessity." See pls. reply mem. of law in support of mot. for class certification at 6-26; Defs. appendix to defs. suppl. brief in opposition to pl. mot. for class certification, exhibit J, no. 6 and exhibit K, no. 24.

(51) It is not clear exactly when IBC's alleged misconduct actually began or what time period the putative classes are intended to cover, except that in 1996, IBC allegedly determined that the costs for chiropractic care had to be reduced and it contracted with HCX, an outside company, to conduct pre-certification review for chiropractic care. Am. compl., ¶37.

(52) Further, in April 1999, IBC created Patient Care Management (PCM) to provide "in-house" pre-certification services and oversee and restrict chiropractic care in order to reduce costs. Am. compl., ¶38.

(53) From a flow chart developed by defendants, it appears that they, through the in-house PCM unit, first utilize pre-certification algorithms upon the initial request for treatment which incorporate the use of nurses in making certain decisions if red flags[11] are identified

---

11. According to the flow chart, "red flags" include (1) less than an eight week lapse from end date of previous case or more than six pre-certifications in the last 24 months; (2) numerous diagnosis (more

and then follow certain guidelines which incorporate diagnosis based pre-certification tables. See pls. exhibit binder at tab S.[12]

(54) A similar flow chart is used for the first and second requests for additional care and incorporate the percentage of improvement in the individual case, as well as making a determination of medical necessity. Pls. exhibit binder at tab S.

(55) Plaintiffs seek certification of: (1) all doctors of chiropractic who are or have been network providers with defendants by virtue of their entering into the IBC provider contract; and (2) a class of all subscribers of health care plans insured, operated or administered by IBC which purport to provide coverage for chiropractic services. Pl. motion for class certification.

(56) As alleged, there are approximately 250 doctors of chiropractic who are network providers in the southeastern Pennsylvania region, where IBC provides health care services to approximately 2.8 million subscribers, as well as approximately 250 doctors of chiropractic in southern New Jersey region, where IBC offers health care services to millions of additional subscribers. Am. compl., ¶27.

(57) The viable claims in this lawsuit are the provider plaintiffs' claims for breach of contract, and the subscriber

than four) documented; (3) pre-certification request for non-musculo-skeletal disorders (*i.e.,* asthma, allergies, ear infections, chronic fatigue, CP, MS, ADD/ADHD, etc.) or (4) request for supportive care or maintenance care. Pls. exhibit binder at tab S.

12. This exhibit binder was presented at the hearing on the motion for certification.

plaintiffs' claims for breach of contract, breach of the implied duty of good faith and fair dealing and violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, codified at 73 P.S. §201-1 et seq.[13] See *Pennsylvania Chiropractic Association v. Independence Blue Cross,* August 2000, no. 2705, slip op. at 10-30 (C.P. Phila. July 16, 2001) (Herron, J.) (ruling on preliminary objections).

(58) Plaintiffs seek monetary damages, resulting from the alleged breaches of contract and a disgorgement of profits earned as a result of the alleged misconduct of defendants, as well as injunctive relief, to enjoin defendants from making pre-certification and coverage determinations which do not comply with the express terms of the contracts. Am. compl., "wherefore clause."

For the reasons set forth below, plaintiffs' motion for class certification is denied in its entirety.

## DISCUSSION

The purpose behind allowing class action suits is "to provide a means by which the claims of many individuals could be resolved at one time, thereby eliminating the possibility of repetitious litigation and providing small claimants with a method to seek compensation for claims that would otherwise be too small to litigate." *DiLucido v. Terminix International Inc.,* 450 Pa. Super. 393, 397, 676 A.2d 1237, 1239 (1996) (citing *Bell v. Beneficial Consumer Discount Co.,* 465 Pa. 225, 231, 348 A.2d 734,

---

13. Specifically, the subscriber plaintiffs' claims are based on sub-sections (v), (vii), (ix) and (xiv) of §201-2(4).

737 (1975)). See also, *Lilian v. Commonwealth*, 467 Pa. 15, 21, 354 A.2d 250, 253 (1976) ("[t]he class action in Pennsylvania is a procedural device designed to promote efficiency and fairness in the handling of large numbers of similar claims"). (footnote omitted)

A motion for class certification addresses not the substance of a plaintiff's claims but rather the procedure by which those claims should be addressed. See Pa.R.C.P. 1707—Explanatory note-1977 (noting that the hearing for certification "is not concerned with the merits of the controversy"). This principle requires that the court focus on the factors set forth in the Pennsylvania Rules of Civil Procedure, not the defendant's specific behavior and legal violations, as alleged in the complaint. For a suit to proceed as class action, Pennsylvania Rule of Civil Procedure 1702 requires that five criteria be met:

"(1) the class is so numerous that joinder of all members is impracticable;

"(2) there are questions of law or fact common to the class;

"(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

"(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

"(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708." Pa.R.C.P. 1702.[14]

---

14. It has been noted that "the requirements for class certification are closely interrelated and overlapping . . . ." *Janicik v. Prudential*

The burden of proving each of these elements is initially on the moving party, although this burden "is not heavy and is thus consistent with the policy that 'decisions in favor of maintaining a class action should be liberally made.'" *Cambanis v. Nationwide Insurance Co.*, 348 Pa. Super. 41, 45, 501 A.2d 635, 637 (1985) (citing *Bell v. Beneficial Consumer Discount Co.*, 241 Pa. Super. 192, 205, 360 A.2d 681, 688 (1976)). Once the moving party has established that each of the elements is satisfied, "the class opponent shoulders the burden, which has shifted, of coming forward with contrary evidence challenging the prima facie case." *D'Amelio v. Blue Cross of Lehigh Valley*, 347 Pa. Super. 441, 449-50, 500 A.2d 1137, 1141 (1985) (*D'Amelio I*).

In the instant case, the court finds that plaintiffs have failed to satisfy the second, third and fifth elements set forth in Rule 1702.[15] Specifically, the court is unconvinced that the complaint presents sufficient questions of fact that are common to the class, that the claims and applicable defenses will be typical throughout the class and that a class action is a fair and efficient method to address the plaintiffs' grievances where the common questions do not predominate over individual issues.

---

*Insurance Company of America*, 305 Pa. Super. 120, 130, 451 A.2d 451, 455 (1982). (citations omitted)

15. Notwithstanding this finding, defendant's allegations of improper solicitation are serious and a concern to the court. However, it is unnecessary to resolve the factually-disputed versions of how the named plaintiffs became parties to this suit because this court's denial of certification is based on other grounds as set forth in the body of the opinion.

The second prong of Rule 1702 requires plaintiffs to show a commonality of issues. As noted in *Janicik v. Prodential Insurance Company of America,* 305 Pa. Super. 120, 451 A.2d 451 (1982):

"Common questions will generally exist if the class members' legal grievances arise out of the 'same practice or course of conduct' on the part of the class opponent. . . . Claims arising from interpretations of a form contract generally give rise to common questions. . . . '[C]lass actions may be maintained even when the claims of members are based on different contracts' so long as 'the relevant contractual provisions raise common questions of law and fact and do not differ materially.' " *Id.* at 133, 451 A.2d at 457. (internal citations and footnote omitted)

"Once a common source of liability has been clearly identified, varying amounts of *damages* among the plaintiffs will not preclude class certification." *Weismer by Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 409, 615 A.2d 428, 431 (1992). (citation omitted) (emphasis in original) "However, where there exist various intervening and possibly superseding causes of damage, liability cannot be determined on a class-wide basis." *Id.*

Determining that there are common questions of fact requires the facts to be substantially the same so that proof as to one plaintiff would be proof as to all. *Allegheny County Housing Authority v. Berry,* 338 Pa. Super. 338, 342, 487 A.2d 995, 997 (1985). "This is what gives the class action its legal viability." *Id.* "If . . . each question of disputed fact has a different origin, a differ-

ent manner of proof and to which there are different defenses, we cannot consider them to be common questions of fact within the meaning of Pa.R.C.P. 1702." *Id.* (citation omitted) See also, *D'Amelio I,* 347 Pa. Super. at 452, 500 A.2d at 1142 ("[w]hile the existence of individual questions is not necessarily fatal, it is essential that there be a *predominance* of common issues shared by all class members which can be justly resolved in a single proceeding."). (emphasis added)

The third prong of Rule 1702 requires that the named plaintiffs' claims and applicable defenses are typical of those of the class. This requirement is "closely akin to the requirements of commonality and the adequacy of representation." *Janicik,* 305 Pa. Super. at 134, 351 A.2d at 457. (citation omitted) "Its purpose is to determine whether the class representative's overall position on the common issues is sufficiently aligned with that of the absent class members to ensure that her pursuit of her own interests will advance those of the proposed class members." *Id.* Accord *D'Amelio I,* 347 Pa. Super. at 458, 500 A.2d at 1146.

Additionally, a court must determine that a class action would constitute a fair and efficient method of resolving the issues in dispute, a conclusion that presupposes finding that "common questions of law or fact predominate over any question affecting only individual members." Pa.R.C.P. 1708.[16]

---

16. Pa.R.C.P. 1708 requires a court to look at the following in evaluating whether a class action is a fair and efficient method of adjudication:

"(1) whether common questions of law or fact predominate over any question affecting only individual members;

Here, it appears that both the provider agreement and the subscriber agreement are form contracts which contain the same, if not substantially similar, definitions for "medical necessity" and both require the defendants, as insurers, to provide coverage to subscribers and/or compensation/reimbursement to providers for the rendering of medically necessary care. See am. compl, exhibit A, ¶¶1.13, 3.1; exhibit B, intro. and p. 7. Further, plaintiffs assert that IBC and the other subsidiary defendants engaged in the same course of conduct where they allegedly adopted policies and practices which resulted in the denial of medically necessary chiropractic treatment in order to reduce medical expenses and maximize profitability. Am. compl., ¶1. Specifically, plaintiffs assert that the common questions of law and fact include:

"(2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;

"(3) whether the prosecution of separate actions by or against individual members of the class would create a risk of

"(i) inconsistent or varying adjudications with respect to individual members of the class which would confront the party opposing the class with incompatible standards of conduct;

"(ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

"(4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;

"(5) whether the particular forum is appropriate for the litigation of the claims of the entire class;

"(6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions;

"(7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action."

"(a) whether IBC has adopted policies and practices which breach the terms and conditions of the IBC provider contract, by, among other things, preventing members of the provider class from being reimbursed for the full scope of services they are qualified and licensed to provide and using improper procedures and guidelines for determining whether proposed chiropractic care is medically necessary;

"(b) whether IBC had adopted policies and practices which breach the terms and conditions of the subscriber agreements, or, alternatively, of the administrative agreements that govern its role in administering health care plans on behalf of the members of the subscriber class, by, among other things, preventing members of the provider class from being reimbursed for the full scope of services they are qualified and licensed to provide and using improper procedures and guidelines for determining whether proposed chiropractic care is medically necessary;

"(c) whether IBC engaged in deceptive conduct and practices in violation of the [UTPCPL] by misrepresenting the nature of the health care services it would provide to members of the subscriber class; and

"(d) whether the provider and subscriber plaintiffs and members of the provider and subscriber classes have sustained damages, and if so, the proper measure of damages, or, alternatively, are entitled to appropriate equitable relief." Pl. mem. of law in support of mot. for class certification at 16.

Notwithstanding these assertions or the fact that common issues may exist, the court believes that the com-

mon issues do not predominate over the individual issues since recovery on each of the plaintiffs' claims depends on a determination of medical necessity in every case.

Two cases which are distinguishable from the present one are *Sharkus v. Blue Cross of Greater Philadelphia,* 494 Pa. 336, 431 A.2d 883 (1981), and *D'Amelio I, supra.*[17] First, in *Sharkus,* the Pennsylvania Supreme Court held that the class action relief was appropriate for medical subscribers who were retroactively denied coverage for hospitalization after treatment had been rendered, plaintiffs had consented to the hospitalization and incurred substantial hospital expenses which Blue Cross had initially paid upon the patient's discharge, but that Blue Cross revoked its previous payment after it retrospectively determined that hospitalization was not medically necessary. 494 Pa. at 345-47, 431 A.2d at 887-88. The class action in that case asserted that Blue Cross had breached its subscription agreements and its fiduciary

---

17. Plaintiffs also argue that the issue in this case concerns IBC's interpretation and performance of key provisions of its health care contract (including the definition of "medical necessity") which were performed in a uniform manner and contrary to any reasonable interpretation. Pls. reply br. at 35. They rely on *McGraw v. Prudential Insurance Co.,* 137 F.2d 1253, 1260 (10th Cir. 1998), which held that the insurance company's denial of benefits for physical therapy and imposition of new conditions for treatment of one patient, suffering from multiple sclerosis, altered the scope of the health care plan and was unreasonable. For purposes of certification, plaintiffs' reliance on *McGraw* is unavailing as that case addressed an ERISA plan of one patient and the court analyzed evidence including the patient's medical history and physical condition in reaching its holding. Rather, the *McGraw* decision would factor more into the merits of plaintiffs' claims which is not at issue in the present motion.

duty to administer its health care system so as to protect subscribers from unknowingly submitting to hospitalizations which were not medically necessary and, therefore, not covered by Blue Cross. *Id.* at 341, 431 A.2d at 885. The medical necessity of the hospitalizations was not at issue, but rather that action concerned whether subscribers were unfairly charged for their hospitalization prior to defendant's amendment of the subscription agreement which provided that the hospital and not the subscriber would bear the responsibility for an admission if Blue Cross justifiably revoked payment on the grounds that hospitalization was not medically necessary. *Id.* at 346, 431 A.2d at 888.

Further, in *D'Amelio I,* the named plaintiff, who was covered by Blue Cross of Lehigh Valley, was admitted to a hospital which determined through its internal review process that his hospitalization was medically necessary. 347 Pa. Super at 445, 500 A.2d at 1139. After the plaintiff's discharge and the hospital's submission of his bill to Blue Cross, Blue Cross conducted its own review and determined that it would only provide benefits for a certain period of time, but it denied benefits for the full period of hospitalization on the grounds that the period of hospitalization was not medically necessary. *Id.* at 446, 500 A.2d at 1139. Thereafter, the hospital sought payment directly from the plaintiff. *Id.* The plaintiff asserted claims against Blue Cross for breach of the subscription agreement and the implied contractual terms by the retrospective denial of coverage. *Id.* at 447, 500 A.2d at 1140. The plaintiff also sought relief against the hospital on a third-party beneficiary theory and asserted a

UTPCPL claim against Blue Cross. *Id.* Bound by *Sharkus,* the Pennsylvania Superior Court held that class action relief was appropriate to determine the legality of Blue Cross' retroactive denial of benefits and that medical necessity was not at issue since the action challenged the procedure utilized by Blue Cross in denying benefits after the rendering of treatment and not whether the provider hospital or Blue Cross were medically correct. *Id.* at 456, 500 A.2d at 1145.

*Sharkus* and *D'Amelio I* both addressed the fairness of Blue Cross' retroactive conduct in denying benefits and not the correctness of the medical necessity determination. Here, in contrast, plaintiffs' claims relate to IBC's prospective conduct and not the denial of benefits after treatment was already rendered. The majority, if not all, of plaintiffs' allegations center on the pre-certification stage which is supposed to occur prior to the rendering of chiropractic services. See am. compl., exhibit B at 23-25. As such, medical necessity is the threshold issue in order to determine whether or not defendants breached either the provider agreements or the subscriber agreements where they allegedly employed and continue to employ practices and procedures which resulted in the denial of coverage for medically necessary care. Medical necessity cannot merely be presumed and must be resolved as a threshold issue in order to determine if a breach in fact occurred. Each of the named providers testified that the determination of medical necessity is decided on a case-by-case basis pursuant to the patient's medical history, the examination of the patient in question and other relevant documentation relating to that

patient's diagnosis. Cecchini dep. at 120-25, 206-207; Eisen dep. at 33, 87; Pfeiffer dep. at 195-97, 201-203; Wright dep. at 183, 199. See also, *Metropolitan Hospital v. Department of Public Welfare,* 21 Pa. Commw. 116, 127-28, 343 A.2d 695, 700 (1975) (refusing to certify a class of hospitals which had determined that hospitalization of patients, eligible for public welfare benefits, was medically necessary while the Utilization Review Committee of the Department of Public Welfare disagreed with the hospitals and refused to make payment on that basis). Because the issue of medical necessity must be resolved before plaintiffs may recover on their claims, the individual issues are too numerous and extensive to find that the common issues predominate. As such, resolving the claims through the class action mechanism would not be a fair and efficient method.

Similarly, the claims and applicable defenses are not typical because one patient or one subscriber's symptoms will be different from another's. Further, both the named providers and the named subscribers testified that they sometimes appealed the denial of benefits or additional chiropractic visits and would sometimes get more visits as a result of those appeals. Cecchini dep. at 126-27, 130-31, 209; Eisen dep. at 75-76, 106-108, 114-15; Pfeiffer dep. at 104-106, 142-43, 148-49, 178-80; Wright dep. at 157-62; Spall dep. at 34-41. Thus, it is not clear that the named representatives were always denied "medically necessary" chiropractic care as a result of defendants' alleged improper practices. Therefore, the court cannot now conclude that the representatives' claims are sufficiently typical to those of the class members.

Additionally, the subscriber plaintiffs' claims under the UTPCPL are also not appropriate for class action relief for similar reasons as enunciated above because the core issue of liability will be dependent on resolving whether treatment recommended by the particular subscriber's doctor was in fact medically necessary. The specific sections upon which the subscriber plaintiffs base their UTPCPL claim are the following:

"(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have . . .; . . .

"(vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another; . . .

"(ix) Advertising goods or services with intent not to sell them as advertised; or . . .

"(xiv) Failing to comply with the terms of any written guarantee or warranty given to the buyer, at, prior to or after a contract for services is made . . . ." 73 P.S. §201-2(4). See am. compl. at ¶117.

The gravamen of the UTPCPL claim, as stated in the amended complaint, is that IBC has misled members of the subscriber class into becoming and remaining IBC subscribers by misrepresenting the terms and conditions of the health care plans and the circumstances under which subscribers will be entitled to coverage for chiropractic care. Am. compl., ¶117. In their memoranda supporting their motion for certification, plaintiffs restate their UTPCPL claim as arising from defendants' material omissions in "failing to disclose their internal sys-

temic policy of denying chiropractic coverage" such that individual reliance may be presumed. Pls. mem. of law in support of mot. for class certification, at 26. Moreover, the named subscriber plaintiffs' UTPCPL claim may only be maintained against QCC Insurance Company, which administers Personal Choice, because the named subscriber plaintiffs have not identified any other insurance company or policy to which they subscribed and because these plaintiffs lack standing to sue any other defendant on this claim for reasons enunciated in a previous opinion in this matter. See *Eisen v. Independence Blue Cross,* August 2000, no. 2705, slip op. at 3, 10-14 (C.P. Phila. May 6, 2002) (Herron, J.); Carl dep. at 19; Spall dep. at 9-16.

As noted by several Pennsylvania appellate court decisions, a private UTPCPL plaintiff, whose right to act arises under UTPCPL section 9.2, must show that he or she was damaged as a result of a defendant's unlawful act.[18] *Weinberg v. Sun Co. Inc.,* 565 Pa. 612, 618, 777 A.2d 442, 446 (2001) (Section 9.2 "clearly requires, in a private action, that a plaintiff suffer an ascertainable loss

---

18. Section 9.2(a) of the UTPCPL reads as follows:

"(a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this Act, may bring a private action to recover actual damages or $100, whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than $100, and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees." 73 Pa.C.S. §201-9.2.

*as a result of* the defendant's prohibited action."). (emphasis in original) (This requires a private plaintiff to show "a causal connection between the unlawful practice and a plaintiff's loss." *DiLucido v. Terminix International Inc.,* 450 Pa. Super. 393, 401-402, 676 A.2d 1237, 1241 (1996). The Pennsylvania Supreme Court recently remarked that the causation requirement found in all private UTPCPL actions required the resolution of "questions of fact applicable to each individual private plaintiff" that would be "numerous and extensive." *Weinberg,* 565 Pa. at 618, 777 A.2d at 446. Cf. *Prime Meats Inc. v. Yochim,* 422 Pa. Super. 460, 471, 619 A.2d 769, 774 (1993) (because a fraud claim requires a showing that the plaintiff acted in reliance on the defendant's misrepresentation, which "would normally vary from person to person, this cause of action is not generally appropriate for resolution in a plaintiff class action").

The same is true for plaintiffs' false advertising, misrepresentation and material omissions claims in this case.[19] Here, plaintiffs have the burden of establishing how the alleged representations or omissions impacted upon each plaintiff, that is, how plaintiffs were induced

---

19. Though plaintiffs do not pursue their UTPCPL warranty claim and have not addressed the issue as to reliance or the "basis of the bargain," nor has this court found much case law addressing this section of the UTPCPL, plaintiffs' claim is analogous to a violation of 13 Pa.C.S. §2313, involving Pennsylvania's adoption of the UCC's express warranty provisions. This court addressed such a claim in *Green v. Saturn Corp.,* 2001 WL 1807390 at *6 (C.P. Phila. Oct. 24, 2001) (Herron, J.) and held that class certification was inappropriate for the plaintiff-buyer's breach of express warranty provision under the UCC because the buyer is required to show that statements were a "basis of the bargain" which is akin to the reliance requirement.

to purchase defendant's services and each member of the class was denied medically necessary care on account of the alleged misrepresentation or material omissions. Establishing liability on each of the class members' claims requires a painstaking survey of each member's transaction and determining whether each member was denied medically necessary care, each of which appears to have taken place under different circumstances, and belies the argument that common questions exist and predominate over individual questions. The named subscriber plaintiffs both testified that they had not talked to any of the defendants prior to selecting Personal Choice, nor did either named subscriber plaintiff identify any misrepresentation to which they relied upon, either within or outside of the subscriber agreement which relates to their denial of coverage for a chiropractic condition. Carl dep. at 19, 27, 35-38; Spall dep. at 15-16, 48-49, 63-66.

Plaintiffs attempt to skirt this issue by arguing that reliance may be presumed when fraud is alleged with respect to a standard form contract. The cases cited by plaintiffs are of no avail even if they stand for the general proposition that reliance may be presumed where a common course of conduct is alleged or a standard form contract is involved. See *Bald Eagle Area School District v. Mid-State Bank and Trust Co.,* 1999 WL 335059, at *8 (Pa. Mar. 31, 1999) (finding that where fraud in the performance of a standard form contract is involved, reliance may either be presumed or inferred); *In re Prudential Insurance Co. America Sales Practices Litigation,* 148 F.3d 283, 314 (3d Cir. 1998) (reliance may be presumed where the fraud-based claims based on mate-

rial omissions stem from a common source of liability); *Varacallo v. Massachusetts Mutual Life Insurance Co.,* 332 N.J. Super. App. Div. 31, 51-52, 752 A.2d 807, 817 (2000) (same).[20] Here, the only way to determine whether in fact defendants are liable under the UTPCPL for material misrepresentations or omissions is to determine if the class members were in fact denied medically necessary care.

Plaintiffs also imply that this court can apply either the Consumer Protection Laws of Pennsylvania, New Jersey or Delaware to the class members' claims as "there is no material conflict" between these laws. Pls. mem. of law in support of mot. for class certification at 30. This assertion is not necessarily true. As defendants point out, plaintiffs need not prove reliance under the New Jersey Consumer Fraud Act though they do have to show an ascertainable loss as a result of defendant's conduct and a causal relationship. See *Caroll v. Cellco Partnership,* 313 N.J. Super. App. Div. 488, 502, 713 A.2d 509, 516 (1998) (ironically denying certification because of the highly individual nature of the claims). Compare *Weinberg,* 565 Pa. 612, 618, 777 A.2d at 446. Rather, applying different states' consumer protection laws depending on where the subscribers are located could pose additional problems in managing a class action.

It seems apparent to this court that the individual questions of fact regarding the issue of medical necessity pre-

20. The *Varacallo* decision also relied on the U.S. Supreme Court's decision in *Affiliated Ute Citizens of Utah,* 406 U.S. 128, 153-54 (1972), which involved alleged securities fraud violations and the failure to disclose and allowed a presumption of reliance on the "fraud on the market" theory which is inapposite to the present case.

clude certification of either the provider or the subscriber classes. As a result, the motion for certification must be denied in its entirety.

## CONCLUSIONS OF LAW

(1) The class action will not provide a fair and efficient method for adjudicating this controversy.

(2) Common questions of law or fact do not predominate over questions affecting only individual members.

(3) The claims raised by the representative parties are not necessarily typical to the claims belonging to, and necessary for, the protection of absent class members.

(4) The court need not determine whether the proposed class representatives will fairly and adequately assert and protect the interests of the class.

(5) The court need not determine whether the class is sufficiently numerous such that joinder of all its members is impracticable.

For these reasons, the court finds that the instant case is not appropriate for disposition as a class action.

## ORDER

And now, July 26, 2002, upon consideration of plaintiffs' motion for class certification, defendants' opposition thereto, the respective memoranda, oral argument held thereon, all other matters of record and in accord with the opinion being filed contemporaneously with this order, it is hereby ordered and decreed that the plaintiffs' motion for class certification is denied.